## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| JIVA INFOTECH, INC., | Case No. 6:22-cv-2372 |
| Plaintiff, | |
| v. | |
| ERP CONSULTANTS INC., STEVEN QUATTRY, AND RON WILKINSON, | |
| Defendants. | |

## COMPLAINT FOR DAMAGES

The plaintiff Jiva InfoTech, Inc. (the "Plaintiff" or "Jiva") for its complaint (the "Complaint") against the defendants ERP Consultants Inc. ("ERP"), Steven Quattry ("Quattry"), and Ron Wilkinson ("Wilkinson") ("ERP", "Quattry" and "Wilkinson" together, the "Defendants"), alleges upon personal knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.      Jiva operates a software company.  By this action, Jiva seeks damages against the Defendants based upon breaches of contract,

1

misappropriation of trade secrets, breaches of loyalty, interference with contracts and business relationships, conversion, as well as civil conspiracy. This action arises out of employment agreements between Jiva and Quattry (the "Quattry Agreement"), and Jiva and Wilkinson (the "Wilkinson Agreement"), respectively.  A true and correct copy of the Quattry Agreement is attached as Exhibit A to this Complaint.  A true and correct copy of the Wilkinson Agreement is attached as Exhibit B to this Complaint.

2.      Quattry and Wilkinson, after selling their businesses to Jiva and entering into employment agreements with Jiva in December 2021, quickly had second thoughts.  By August 2022, and while still Jiva employees, they secretly plotted to leave Jiva and created a new competing company, ERP, using Jiva's trade secrets, including its proprietary customer and vendor information, as well as Jiva's company assets.

3.      Then, in October 2022 and with two weeks notice, Quattry and Wilkinson left Jiva to operate their competing company, ERP.  Between then and the present, Quattry and Wilkinson built their new business by soliciting Jiva's customers and employees, using Jiva's trade secrets, and converting Jiva's assets, in violation of their employment agreements.

4.      Jiva brings this action to recover for the enormous business losses caused by the Defendants' decision to sidestep the hard work required to establish a business in the competitive software industry.

2

## THE PARTIES

5.      Jiva is a New Jersey corporation with its principal place of business in Middlesex County, New Jersey.

6.      ERP is a Florida corporation with its principal place of business in Seminole County, Florida.

7.      Quattry is an individual residing in Seminole County, Florida.

8.      Wilkinson is an individual residing in Lake County, Ohio.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction of this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity of citizenship exists.

10.     Personal jurisdiction over Quattry exists because Quattry is a resident of Seminole County, Florida.  Quattry is also subject to personal jurisdiction through his consent to the jurisdiction of this court in the Quattry Agreement, in which he agreed that "the federal courts and/or state courts of the State of Florida, shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement and/or employment relationship or termination thereof and Employee consents to such jurisdiction and venue." Ex. A, Paragraph 7.7, Quattry Agreement.

11.     Personal jurisdiction over Wilkinson exists through his consent to the jurisdiction of this court in the Wilkinson Agreement, in which he agreed

3

that "the federal courts and/or state courts of the State of Florida, shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement and/or employment relationship or termination thereof and Employee consents to such jurisdiction and venue." Ex. B, Paragraph 13.7, Wilkinson Agreement.

12.     Venue is proper under 28 U.S.C. § 1391(b) because Quattry is a resident in this District, a substantial part of the events giving rise to the claims occurred in this District, and Quattry and Wilkinson consented to the venue of this court to hear the disputes in this Complaint.

13.     The Orlando Division is appropriate because the action is most directly connected to Seminole County, which is in the Orlando Division.

14.     Each of the claims in this Complaint are not subject to arbitration because the relevant parties agreed that "disputes or claims brought by either the Company or Employee relating to or arising out of trade secrets, proprietary information, non-solicitation agreements, and other provisions expressly prohibited by law from being subject to binding arbitration," were exempt from the parties' arbitration agreement. *See* Ex. A, Paragraph 7.2, Quattry Agreement; *see also* Ex. B. Paragraph 13.2, Wilkinson Agreement.

## FACTUAL ALLEGATIONS

**A.     The relevant parties and their businesses.**

15.    Jiva is a company providing software and services related to software.

16.    Quattry and Wilkinson were employees of Jiva between about January and October 2022, after they sold their stock and membership interests in QT Consulting, Inc., and Mentor Consulting Service, LLC, to Jiva on around December 31, 2022.

17.    ERP is the new corporation created by Quattry, Wilkinson, and others to compete with Jiva.

**B.     Quattry and Wilkinson enter into employment agreements with Jiva following the sale of their two companies to Jiva.**

18.    From the outset of Quattry and Wilkinson's employment with Jiva, Jiva made substantial efforts to maintain the secrecy of its (and its' subsidiaries') trade secrets, and confidential and proprietary information, which is identified in greater detail below.

19.    On around December 31, 2021, Quattry and Jiva entered into an employment agreement (the "Quattry Agreement").  Under the Quattry Agreement, Jiva employed Quattry as a VP of Sales and Business Development for three years, subject to terms.

20.     In the Quattry Agreement, Quattry contracted that during his
employment, and for a period of two years afterwards, Quattry would not
solicit any of Jiva's (or its subsidiaries' or affiliates') customers, employees, or
consultants. *See* Ex. A, Paragraph 5.1 Quattry Agreement.

21.     As part of the Quattry Agreement, Quattry acknowledged that by
reason of his employment with Jiva, that he would have access to and learn
about confidential, secret, and proprietary documents, materials, data and
other information, in tangible and intangible form, of and relating to Jiva and
its businesses and existing and prospective customers, suppliers, vendors,
investors, and other associated third parties, including, without limitation,
trade secrets, technology, and information pertaining to business operations
and strategies, research and development, customers, vendors, products,
pricing, marketing, finances, sourcing, personnel, or operations of Jiva, its
affiliates, or their suppliers and customers, in each case whether spoken,
written, printed, electronic or in any other form or medium (collectively, the
"Confidential Information"). Quattry agreed to treat all Confidential
Information as strictly confidential.

22.     As part of the Quattry Agreement, Quattry acknowledged that by
reason of his employment with Jiva, that he would have access to and learn
about certain information related to Jiva's vendors, which could include, but
is not limited to, names, phone numbers, addresses, email addresses, order

6

history, product offerings, chain of command, pricing information, and other information identifying facts and circumstances specific to the vendor (collectively, the "Vendor Information"). Quattry agreed to treat all Vendor Information as strictly confidential.

23.     As part of the Quattry Agreement, Quattry acknowledged that by reason of his employment with Jiva, that he would have access to and learn about certain information related to Jiva's customers, which could include, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer (collectively, the "Customer Information"). Quattry agreed to treat all Customer Information as strictly confidential.

24.     During his employment with Jiva, Quattry did in fact have access to Confidential Information, Vendor Information, and Customer Information. Quattry was part of Jiva's strategy sessions and management decisions setting the direction of the company and its affiliates.

25.     The Quattry Agreement contained confidentiality obligations prohibiting Quattry from disclosing, publishing, communicating, or making available Confidential Information, or allowing it to be disclosed, published, communicated, or made available, in whole or in part, to any entity or person whatsoever not having a need to know and authority to know and use the

7

Confidential Information in connection with the business of Jiva, and in any event, not to anyone outside of the direct employ of Jiva except as required in the performance of Quattry's authorized employment duties to Jiva or with the prior consent of Jiva in each instance (and then, such disclosure must have been made only within the limits and to the extent of such duties or consent).

26.     The Quattry Agreement required Quattry to hold Confidential Information in the strictest confidence, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of Jiva, except as required in the performance of Quattry's authorized employment duties to Jiva or with the prior written consent of Jiva in each instance (and then, such disclosure must have been made only within the limits and to the extent of such duties or consent), since all Confidential Information was owned by Jiva and kept in strict confidence.

27.     Jiva included the requirements in the Quattry Agreement concerning Confidential Information, Vendor Information, and Customer Information in an effort to maintain the confidentiality of its client lists, among other reasons. Jiva's client lists are not limited to only names and contact information, but other data, statistics, analytical information,

8

information regarding ongoing projects, and customer and vendor requirements for such projects, that is not generally known to the public and from which Jiva derives substantial, independent economic value.

28.     Jiva included the foregoing requirements in the Quattry Agreement to advise Quattry of the existence of trade secrets.

29.     During Quattry's employment with Jiva, he gained knowledge of Jiva's Confidential Information, Vendor Information, and Customer Information. Additionally, he had access to Jiva's password-protected software and computers, which contained Confidential Information, Vendor Information, and Customer Information, including but not limited to such non-public information vital to Jiva's business such as business operations and strategies, Jiva's research and development, vendor information, product information, pricing information, marketing, and information regarding affiliates, including such affiliates' suppliers or customers.

30.     Through Quattry's employment with Jiva, he frequently interacted with Jiva's customers and vendors, giving him real and actual knowledge of the contractual and business relationships between Jiva and those customers and vendors, and the unique needs, ongoing projects, and business practices of each such customer and/or vendor.

31.    As part of the Quattry Agreement, Jiva and Quattry agreed that a prevailing party in any action arising from this agreement would be entitled to their reasonable attorneys' fees and costs.

32.    On around December 31, 2021, Wilkinson and Jiva entered into an employment agreement (the "Wilkinson Agreement").  Under the Wilkinson Agreement, Jiva employed Wilkinson as a VP of ERP Services and Delivery for three years, subject to terms.

33.    In the Wilkinson Agreement, Wilkinson contracted that during his employment, and for a period of two years afterwards, Wilkinson would not solicit any of Jiva's (or its subsidiaries' or affiliates') customers, employees, or consultants. *See* Ex. B, Paragraph 11.1 Wilkinson Agreement.

34.    As part of the Wilkinson Agreement, Wilkinson acknowledged that by reason of his employment with Jiva, that he would have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to Jiva and its businesses and existing and prospective customers, suppliers, vendors, investors, and other associated third parties, including, without limitation, trade secrets, technology, and information pertaining to business operations and strategies, research and development, customers, vendors, products, pricing, marketing, finances, sourcing, personnel, or operations of Jiva, its affiliates, or their suppliers and customers, in each case whether

10

spoken, written, printed, electronic or in any other form or medium (collectively, the "Confidential Information"). Wilkinson agreed to treat all Confidential Information as strictly confidential.

35.     As part of the Wilkinson Agreement, Wilkinson acknowledged that by reason of his employment with Jiva, that he would have access to and learn about certain information related to Jiva's vendors, which could include, but is not limited to, names, phone numbers, addresses, email addresses, order history, product offerings, chain of command, pricing information, and other information identifying facts and circumstances specific to the vendor (collectively, the "Vendor Information"). Wilkinson agreed to treat all Vendor Information as strictly confidential.

36.     As part of the Wilkinson Agreement, Wilkinson acknowledged that by reason of his employment with Jiva, that he would have access to and learn about certain information related to Jiva's customers, which could include, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer (collectively, the "Customer Information"). Wilkinson agreed to treat all Customer Information as strictly confidential.

37.     During his employment with Jiva, Wilkinson did in fact have access to Confidential Information, Vendor Information, and Customer

11

Information. Wilkinson was part of Jiva's strategy sessions and management decisions setting the direction of the company and its affiliates.

38.     The Wilkinson Agreement contained confidentiality obligations prohibiting Wilkinson from disclosing, publishing, communicating, or making available Confidential Information, or allowing it to be disclosed, published, communicated, or made available, in whole or in part, to any entity or person whatsoever not having a need to know and authority to know and use the Confidential Information in connection with the business of Jiva, and in any event, not to anyone outside of the direct employ of Jiva except as required in the performance of Wilkinson's authorized employment duties to Jiva or with the prior consent of Jiva in each instance (and then, such disclosure must have been made only within the limits and to the extent of such duties or consent).

39.     The Wilkinson Agreement required Wilkinson to hold Confidential Information in the strictest confidence, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of Jiva, except as required in the performance of Wilkinson's authorized employment duties to Jiva or with the prior written consent of Jiva in each instance (and then, such disclosure must have been made only within the limits and to the extent of

12

such duties or consent), since all Confidential Information was owned by Jiva and kept in strict confidence.

40.    Jiva included the requirements in the Wilkinson Agreement concerning Confidential Information, Vendor Information, and Customer Information in an effort to maintain the confidentiality of its client lists, among other reasons. Jiva's client lists are not limited to only names and contact information, but other data, statistics, analytical information, information regarding ongoing projects, and customer and vendor requirements for such projects, that is not generally known to the public and from which Jiva derives substantial, independent economic value.

41.    Jiva included the foregoing requirements in the Wilkinson Agreement in order to advise Wilkinson of the existence of trade secrets.

42.    During Wilkinson's employment with Jiva, he gained knowledge of Jiva's Confidential Information, Vendor Information, and Customer Information. Additionally, he had access to Jiva's password-protected computers and software, which contained Confidential Information, Vendor Information, and Customer Information, including but not limited to such non-public information vital to Jiva's business such as business operations and strategies, Jiva's research and development, vendor information, product information, pricing information, marketing, and information regarding affiliates, including such affiliates' suppliers or customers.

43.     Through Wilkinson's employment with Jiva, he frequently interacted with Jiva's customers and vendors, giving him real and actual knowledge of the contractual and business relationships between Jiva and those customers and vendors, and the unique needs, ongoing projects, and business practices of each such customer and/or vendor.

44.     As part of the Wilkinson Agreement, Jiva and Wilkinson agreed that a prevailing party in any action arising from this agreement would be entitled to their reasonable attorneys' fees and costs.

C.     **As part of a scheme to set up a new competing company with Jiva, and while still Jiva employees, Quattry and Wilkinson solicited Jiva's customers, and converted Jiva's proprietary information and assets for their personal benefit.**

45.     By around August 2022, and despite Quattry and Wilkinsons' obligations to Jiva under the Quattry Agreement and the Wilkinson Agreement, respectively, Quattry, Wilkinson, and other Jiva employees began implementing a plan to start a new company that competed with Jiva and its subsidiaries and affiliates, despite the Quattry Agreement and Wilkinson Agreement.

46.     Quattry, Wilkinson, and others devised their scheme long before their employment ended with Jiva.

14

47.    By around August 2022, Quattry, Wilkinson, and others acted to divert Jiva's revenue to at least one secret bank account controlled by them and not known to Jiva at that time.

48.    Indeed, Wilkinson wrote to his co-conspirators that "[w]e'll use our account that only we have access to."

49.    Around that time, Quattry had, without Jiva's authorization, removed all funds from an account held by Jiva's subsidiary, Mentor Consulting Services, LLC.

50.    Also around that time, Wilkinson directed that company revenue be moved to an "old" account held by a Jiva subsidiary, which they could utilize for their personal purposes without Jiva's knowledge.

51.    Quattry, Wilkinson, and others also directed that revenue beginning in September 2022 would be directed to an account held by them, for the benefit of a new competing company they were starting—ERP.

52.    Quattry, Wilkinson, and others discussed how to ensure that they could personally take possession of Jiva's funds without Jiva's interference or knowledge.

53.    Around that same time, Quattry discussed concerns about Jiva seeing their correspondence detailing their plans to steal Jiva's customers and company funds to begin ERP, a competing company.

54.     As a result of these plans, Quattry, Wilkinson, and others stopped performing their duties for Jiva.

55.     For instance, in September 2022, one of Jiva's customers, Paul Bensel Jewelers, repeatedly emailed Wilkinson and others to determine why Wilkinson had not shown up for scheduled meetings or performed work that had been requested long ago.

56.     Around that same time, Quattry, Wilkinson, and others decided to "accelerate our plans" to leave Jiva, take its customers and assets, and open a competing company.

57.     In September 2022, Quattry, Wilkinson, and others created this new company to compete with Jiva called ERP Consultants Inc.  A true and correct copy of ERP's Articles of Incorporation is attached as Exhibit C to this Complaint.

58.      In September 2022, Quattry, Wilkinson, and others incorporated ERP Consultants Inc. ("ERP") in Florida, and obtained an employment identification number.

59.     In September 2022, Quattry, Wilkinson, and others purchased at least two internet domains for ERP.

60.     In September 2022, Quattry, Wilkinson, and others activated email accounts for ERP.

16

61.     In October 2022, before they left their employment with Jiva, Quattry, Wilkinson, and others directed that certain commissions earned for Jiva through the company, EBizCharge, to be directed to a secret bank account controlled by them, without Jiva's knowledge.

62.     In October 2022, after Wilkinson gave Jiva notice of Quattry's, his, and others' intention to quit working for Jiva, they secretly discussed ensuring that there was sufficient money in a Jiva bank account to pay their last payroll payment on around October 15, 2022.

63.     Indeed, they also sought additional funds from Jiva despite already concluding that there were sufficient funds in the account from which their payroll wages would be drawn.

64.     In October 2022, before they left their employment for Jiva, Quattry and Wilkinson made numerous unauthorized expenses.

65.     These unauthorized expenses included health insurance, automobile charges (such as a vehicle lease), as well as technology charges. These total at least $35,684.56.

66.     In early October 2022, Quattry directed Wilkinson to "[d]elete this email and then delete it from your deleted items,]" because it could incriminate them and show how they had acted against Jiva's interests.

67.     In early October 2022, Quattry set up a meeting with a Jiva customer on around October 19, 2022, even though he knew he would no

longer be a Jiva employee and would be working for a competing a business at that time.

68.     In early October 2022, Jiva's client, Air Electro, sought urgent assistance from Wilkinson.  When Air Electro didn't receive a response, it followed up and noted that it had been many weeks since the project started and Wilkinson had failed to communicate with them.

69.     Back in August 2022, Wilkinson insisted that he would handle this project by himself.  But instead of handling it, he let the project languish and he failed to communicate with Air Electro.

70.     On around October 12, 2022, Quattry, in regards to Air Electro, stated to Wilkinson that "[w]e could still pick them up as a customer, which I am sure you[] are thinking about."

71.     Despite Quattry's knowledge of the Quattry Agreement and the Wilkinson Agreement, he proceeded to solicit Jiva's customers both while he was an employee of Jiva, and afterwards.

72.     On October 14, 2022, Quattry and Wilkinson worked their last day for Jiva.

73.     On around October 14, 2022, and Quattry and Wilkinson worked to change the banking information included on an invoice to a Jiva customer, High Mountain Imports.

74.     This new banking information meant that High Mountains Imports' payment to Jiva would go to a secret account controlled by Quattry and Wilkinson.

75.     On around October 14, 2022, and Quattry and Wilkinson also declined to cooperate with Jiva in providing the 2021 tax returns filed by a subsidiary company of Jiva, Mentor Consulting Services, LLC, which Quattery and Wilkinson previously sold to Jiva.

76.     On around October 17, 2022, Wilkinson continued to solicit business and work from Jiva's customer, Arms Trucking, all while using his email for Jiva subsidiary, Mentor Consulting Services, LLC, without authorization.  Wilkinson acted as if the relationship hadn't changed in a meaningful way, such that Arms Trucking could still use hours it had pre-paid to Mentor Consulting Services, LLC.

77.     On that same day, Wilkinson responded to another Jiva customer, Visual Eyes Eyewear, and did not mention his change of employment and continued to solicit their business for his new competitive venture.

78.     On around October 20, 2022, Wilkinson wrote to the Jiva customer, Terral River Services, Inc., in an email entitled, "Re-Branding."  In that correspondence, Wilkinson informed them that, among other things,

19

"with things changing much in the world today we felt time for a corporation change.  Still same folks but adding more resources for better service."

79.    Wilkinson solicited the business of Terral River Services, Inc., to the detriment of Jiva.

80.    Wilkinson and Quattry have continued to solicit other customers of Jiva (and its subsidiaries), including Motor City Materials, Alpha Industries, and Data Media Associates, causing these customers to hire them.

81.    Wilkinson and Quattry have also used the assets of Jiva, including of its subsidiaries, to solicit Jiva's customers both before and after their employment for Jiva.

82.    At this time, Jiva has identified about 13 customers, including customers of its subsidiaries, that Wilkinson and Quattry solicited in violation of the Wilkinson Agreement and Quattry Agreement, respectively.

83.    These solicited customers, including the approximate amount of lost profits suffered by Jiva from these solicitations, are as follows: Osborne Industries ($185,000), Air Electro, Inc. ($280,000), High Mountain Imports ($185,000), Flyin' Miata ($396,000), Visual Eyes Eyewear, LLC $185,000), Alpha Industries ($462,500), Motor City Materials LLC ($196,495), Terral River Services, Inc. ($462,500), The Arms Trucking, Co. ($185,000), Data Media Associates ($210,555), HI TecMetal Group Inc. ($185,000), Lengamann Corporation ($185,000), and Power-Pack Conveyors Inc. ($185,000).

84.     Quattry and Wilkinson knew that their efforts to start a new company that competed with Jiva (or its affiliates) violated the Quattry Agreement and Wilkinson Agreement, since they intended to solicit the customers and employees of Jiva (or its subsidiaries and affiliates).

85.     The Defendants are liable to Jiva in an amount to be determined at trial but in no event less than $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs.

## COUNT I

### (Breach of Contract Against Quattry)

86.     Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

87.     Jiva and Quattry executed the Quattry Agreement on around December 2021.

88.     As part of the Quattry Agreement, Quattry agreed "that, without the approval of [Jiva's] Board, [Quattry] shall not, during the period of employment with [Jiva], devote any time to any business affiliation which would interfere with or derogate from [Quattry]'s obligations under th[e Quattry] Agreement."

89.     As part of the Quattry Agreement, Quattry agreed not to solicit Jiva's customers, including Jiva's subsidiaries or affiliates, until two years after he left his employment with Jiva.

21

90.     As part of the Quattry Agreement, Quattry agreed not to induce Jiva's employees to leave Jiva, including those of Jiva's subsidiaries or affiliates, until two years after he left his employment with Jiva.

91.     As part of the Quattry Agreement, Quattry agreed to treat Jiva's Confidential Information, Customer Information, and Vendor Information, as strictly confidential.

92.     As part of the Quattry Agreement, Quattry agreed not to disclose or otherwise make available Jiva's Confidential Information, Customer Information, or Vendor Information, to anyone except in connection with his employment for Jiva, or with the written authorization of Jiva's president, CEO, or board of directors.

93.     As part of the Quattry Agreement, Quattry agreed not to use Jiva's Confidential Information, Customer Information, or Vendor Information, except in connection with his employment for Jiva, or with the written authorization of Jiva's president, CEO, or board of directors.

94.     As part of the Quattry Agreement, Quattry agreed to comply with Jiva's policies and guidelines related to Confidential Information, Customer Information, and Vendor Information.

95.     As part of the Quattry Agreement, Quattry agreed that Jiva was the sole owner of all Confidential Information, Customer Information, and Vendor Information.

96.     In breach of his contractual obligations, Quattry failed to act in Jiva's best interest.  Instead, while employed by Jiva, Quattry contacted customers, vendors, and other Jiva employees in an attempt to induce them to breach contracts with Jiva and to divert their business to a competing enterprise established by him and others.

97.     In further breach of his contractual obligations, Quattry used and disclosed Jiva's Confidential Information, Customer Information, and Vendor Information, for the purpose of, among other things, soliciting customers and vendor business away from Jiva and to induce existing Jiva employees to terminate their relationships with Jiva and join a competing enterprise established by him and others.

98.     In further breach of his contractual obligations, Quattry failed to return all of Jiva's company property, including Confidential Information, Customer Information, and Vendor Information. Further, Quattry has improperly accessed Jiva's computer systems in preparation for his planned termination of the Quattry Agreement and the establishment of a competing enterprise.

99.     As a direct and proximate result of Quattry's breach, Jiva has suffered extensive damage, in an amount to be determined at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

100.   Jiva will continue to be directly and proximately damaged, and its good will irreparably harmed, if Quattry is not enjoined from further violation of the Quattry Agreement, and if Quattry is not directed to comply with the Quattry Agreement, and prohibited from using and disclosing Jiva's confidential and proprietary information. Jiva has no adequate remedy at law as money damages alone will not fully compensate Jiva, and injunctive relief is warranted to prevent further irreparable harm to Jiva.

## COUNT II

### (Breach of Contract Against Wilkinson)

101.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

102.   Jiva and Wilkinson executed the Wilkinson Agreement on around December 2021.

103.   As part of the Wilkinson Agreement, Wilkinson agreed "that, without the approval of [Jiva's] Board, [Wilkinson] shall not, during the period of employment with [Jiva], devote any time to any business affiliation which would interfere with or derogate from [Wilkinson]'s obligations under th[e Wilkinson] Agreement."

104.   As part of the Wilkinson Agreement, Wilkinson agreed not to solicit Jiva's customers, including Jiva's subsidiaries or affiliates, until two years after he left his employment with Jiva.

105.   As part of the Wilkinson Agreement, Wilkinson agreed not to induce Jiva's employees to leave Jiva, including those of Jiva's subsidiaries or affiliates, until two years after he left his employment with Jiva.

106.   As part of the Wilkinson Agreement, Wilkinson agreed to treat Jiva's Confidential Information, Customer Information, and Vendor Information, as strictly confidential.

107.   As part of the Wilkinson Agreement, Wilkinson agreed not to disclose or otherwise make available Jiva's Confidential Information, Customer Information, or Vendor Information, to anyone except in connection with his employment for Jiva, or with the written authorization of Jiva's president, CEO, or board of directors.

108.   As part of the Wilkinson Agreement, Wilkinson agreed not to use Jiva's Confidential Information, Customer Information, or Vendor Information, except in connection with his employment for Jiva, or with the written authorization of Jiva's president, CEO, or board of directors.

109.   As part of the Wilkinson Agreement, Wilkinson agreed to comply with Jiva's policies and guidelines related to Confidential Information, Customer Information, and Vendor Information.

110.   As part of the Wilkinson Agreement, Wilkinson agreed that Jiva was the sole owner of all Confidential Information.

111.   In breach of his contractual obligations, Wilkinson failed to act in

25

Jiva's best interest. Instead, while employed by Jiva, Wilkinson contacted customers, vendors, and other Jiva employees in an attempt to induce them to breach contracts with Jiva and to divert their business to a competing enterprise established by him and others.

112.   In further breach of his contractual obligations, Wilkinson used and disclosed Jiva's Confidential Information, Customer Information, and Vendor Information, for the purpose of, among other things, soliciting customers and vendor business away from Jiva and to induce existing Jiva employees to terminate their relationships with Jiva and join a competing enterprise established by him and others.

113.   In further breach of his contractual obligations, Wilkinson failed to return all of Jiva's company property, including Confidential Information, Customer Information, or Vendor Information. Further, Wilkinson has improperly accessed Jiva's computer systems in preparation for his planned termination of the Wilkinson Agreement and the establishment of a competing enterprise.

114.   As a direct and proximate result of Wilkinson's breach, Jiva has suffered extensive damage, in an amount to be determined at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

115.   Jiva will continue to be directly and proximately damaged, and

26

its good will irreparably harmed, if Wilkinson is not enjoined from further violation of the Wilkinson Agreement, and if Wilkinson is not directed to comply with the Wilkinson Agreement, and prohibited from using and disclosing Jiva's confidential and proprietary information. Jiva has no adequate remedy at law as money damages alone will not fully compensate Jiva, and injunctive relief is warranted to prevent further irreparable harm to Jiva.

## COUNT III

## (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.,

## Against ERP, Quattry, and Wilkinson)

116.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

117.   Jiva's Confidential Information, Customer Information, and Vendor Information, constitute "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.

118.   Jiva possessed trade secret information relating to Jiva's proprietary business practices, including Jiva's subsidiaries. Such information derives its value from not being known or readily ascertainable by third parties.

119.   Jiva has expended significant funds since the inception of its

business in the creation, development, and cultivation of these trade secrets, and it would be exceedingly difficult – if not impossible – for a competitor, or any other party, to create, develop, or cultivate the same information.

120.   Indeed, Jiva purchased two of its subsidiaries from Quattry and Wilkinson partly for their informational assets.

121.   Jiva took reasonable measures under the circumstances to maintain the secrecy of its trade secrets, including without limitation by limiting access to this information only to authorized personnel and by securing its electronic materials using password-protected software.

122.   Quattry and Wilkinson received access to Jiva's trade secrets only after signing the Quattry Agreement and Wilkinson Agreement, respectively.

123.   Quattry had a duty, and knew he had a duty, to maintain the secrecy of all trade secrets he received and/or had access to by reason of his employment with Jiva, and to use it exclusively in furtherance of his employment duties, with Jiva's best interest in mind at all times.

124.   Wilkinson had a duty, and knew he had a duty, to maintain the secrecy of all trade secrets he received and/or had access to by reason of his employment with Jiva, and to use it exclusively in furtherance of his employment duties, with Jiva's best interest in mind at all times.

125.   Despite Quattry's full awareness of his duty to maintain the

secrecy of such information, Quattry misappropriated the trade secrets through his improper use and disclosure of Jiva's Confidential Information, Customer Information, and Vendor Information.

126.   Despite Wilkinson's full awareness of his duty to maintain the secrecy of such information, Wilkinson misappropriated the trade secrets through his improper use and disclosure of Jiva's Confidential Information, Customer Information, and Vendor Information.

127.   Quattry improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of efforts to establish a competing enterprise with Jiva, to Jiva's detriment.

128.   Wilkinson improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of efforts to establish a competing enterprise with Jiva, to Jiva's detriment.

129.   Quattry improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of an effort to disparage Jiva, divert business away from Jiva, and interfere with Jiva's relationships with its customers, vendors, and employees.

130.   Wilkinson improperly utilized Jiva's Confidential Information,

Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of an effort to disparage Jiva, divert business away from Jiva, and interfere with Jiva's relationships with its customers, vendors, and employees.

131.   Quattry and Wilkinson improperly disclosed Jiva Confidential Information, Customer Information, and Vendor Information, to ERP and ERP's shareholders, officers, and employees, among others.

132.   Jiva did not consent to Quattry's use and disclosure of any trade secrets beyond as permitted in the Quattry Agreement.

133.   Jiva did not consent to Wilkinson's use and disclosure of any trade secrets beyond as permitted in the Wilkinson Agreement.

134.   Quattry continues to misappropriate Jiva's trade secrets as a representative, officer, and agent of ERP.

135.   Wilkinson continues to misappropriate Jiva's trade secrets as a representative, officer, and agent of ERP.

136.   ERP, through Quattry, Wilkinson, and others, acquired, disclosed, and used Jiva's trade secrets through improper means, i.e., Quattry's and Wilkinson's misappropriation.

137.   As a result of the Defendants' misappropriation, Jiva will be damaged, in an amount to be proven at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of

suit.

138.   Because Defendants' acts of improper use and disclosure were done with a conscious disregard of Jiva's rights and a desire to profit from such disclosures while causing Jiva competitive harm, the acts of use and disclosure were "willful and malicious," as set forth in 18 U.S.C. §§ 1836(b)(3)(C) and 1836(b)(3)(D).

139.   Jiva seeks and is entitled to preliminary and permanent injunctive relief for the actual and threatened misappropriation of its trade secrets. In the alternative, Jiva seeks damages, in an amount to be proven at trial.

## COUNT IV

### (Misappropriation of Trade Secrets Under the Florida Uniform Trade Secrets Act, Fla. Stat. Ann. § 688.001 et seq., Against ERP, Quattry, and Wilkinson)

140.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

141.   Jiva's Confidential Information, Customer Information, and Vendor Information, constitute "trade secrets" under the Florida Uniform Trade Secrets Act.

142.   Jiva's Confidential Information, Customer Information, and Vendor Information, derives substantial, independent economic value from

not being generally known to the public or to Jiva's competitors, who could obtain economic value from the information.

143.   Jiva expended substantial financial and human resources to develop its trade secrets, which cannot be easily acquired or replicated by others.

144.   Jiva has taken substantial efforts to maintain the secrecy of its trade secrets, including but not limited to restricting access to such information, designating such information as confidential, and obtaining confidentiality agreements.

145.   Quattry and Wilkinson misappropriated Jiva's trade secrets through his improper use and disclosure of Jiva's Confidential Information, Customer Information, and Vendor Information.

146.   Quattry improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of efforts to establish a competing enterprise with Jiva, to Jiva's detriment.

147.   Wilkinson improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of efforts to establish a competing enterprise with Jiva, to Jiva's detriment.

148.   Quattry improperly utilized Jiva's Confidential Information,

Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of an effort to disparage Jiva, divert business away from Jiva, and interfere with Jiva's relationships with its customers, vendors, and employees.

149.   Wilkinson improperly utilized Jiva's Confidential Information, Customer Information, and Vendor Information, through accessing, referencing, and/or otherwise employing such information in furtherance of an effort to disparage Jiva, divert business away from Jiva, and interfere with Jiva's relationships with its customers, vendors, and employees.

150.   Quattry and Wilkinson improperly disclosed Jiva Confidential Information, Customer Information, and Vendor Information, to ERP and ERP's shareholders, officers, and employees, among others.

151.   Jiva did not consent to Quattry's use and disclosure of any trade secrets beyond as permitted in the Quattry Agreement.

152.   Jiva did not consent to Wilkinson's use and disclosure of any trade secrets beyond as permitted in the Wilkinson Agreement.

153.   Quattry continues to misappropriate Jiva's trade secrets as a representative, officer, and agent of ERP.

154.   Wilkinson continues to misappropriate Jiva's trade secrets as a representative, officer, and agent of ERP.

155.   ERP, through Quattry, Wilkinson, and others, acquired,

disclosed, and used Jiva's trade secrets through improper means, i.e., Quattry's, Wilkinson's, and others misappropriation.

156.   Defendants' misappropriation of Jiva's confidential and proprietary business and customer information will destroy the value of this information and diminish the competitive advantage that such information provides to Jiva. In addition, Defendants' conduct will cause the diversion of substantial business from Jiva.

157.   As a result of the Defendants' misappropriation, Jiva will be damaged, in an amount to be proven at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

158.   As a direct and proximate result of the Defendants' misappropriation of Jiva's trade secrets, Jiva has sustained and will continue to sustain substantial pecuniary losses and irreparable injury, the damages from which cannot now be calculated and from which Jiva's remedies at law are not adequate to compensate for the injuries inflicted by the Defendants. Accordingly, Jiva is entitled to injunctive relief and/or damages.

## COUNT V

### (Breach of Duty of Loyalty Against Quattry and Wilkinson)

159.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

34

160.   As employees of Jiva, Quattry and Wilkinson owed Jiva their undivided loyalty and were obligated to act with the utmost good faith, and in Jiva's best interests.

161.   In the Quattry Agreement and the Wilkinson Agreement, respectively, Quattry and Wilkinson agreed that during their employment for Jiva, each would not, without Jiva's approval, "devote any time to any business affiliation which would interfere with or derogate from" their obligations in the Quattry Agreement and the Wilkinson Agreement, respectively.

162.   Jiva was entitled to place its trust and confidence in Quattry and Wilkinson and to expect Quattry and Wilkinson to act with the utmost good faith toward it in carrying out Jiva's business.

163.   Jiva relied on Quattry and Wilkinson's loyalty and integrity and their faithful performance of their duties and responsibilities.

164.   Quattry took advantage of Jiva's reliance by not performing his duties to Jiva, by acting in conflict of interest, by engaging in business for his personal gain to Jiva's detriment, by engaging in business in competition with Jiva while employed with Jiva, by soliciting Jiva's (and its subsidiaries' and affiliates') customers and vendors to terminate their relationships with Jiva, by inducing, encouraging, and soliciting Jiva's (and its subsidiaries' and affiliates') employees to terminate their relationships with Jiva (and its

35

subsidiaries and affiliates), by deceiving Jiva and concealing his improper conduct, by using and disclosing Jiva's Confidential Information, Customer Information, and Vendor Information, by converting Jiva's assets for his own personal gain, and by charging unauthorized expenses to Jiva.

165.   Wilkinson took advantage of Jiva's reliance by not performing his duties to Jiva, by acting in conflict of interest, by engaging in business for his personal gain to Jiva's detriment, by engaging in business in competition with Jiva while employed with Jiva, by soliciting Jiva's (and its subsidiaries' and affiliates') customers and vendors to terminate their relationships with Jiva, by inducing, encouraging, and soliciting Jiva's (and its subsidiaries' and affiliates') employees to terminate their relationships with Jiva (and its subsidiaries and affiliates), by deceiving Jiva and concealing his improper conduct, by using and disclosing Jiva's Confidential Information, Customer Information, and Vendor Information, by converting Jiva's assets for his own personal gain, and by charging unauthorized expenses to Jiva.

166.   Quattry knowingly and willfully breached his duty of loyalty to Jiva by scheming to deceive, defraud, and undermine Jiva, misappropriating and stealing Jiva's (and its subsidiaries' and affiliates') trade secrets and assets, and attempting to divert Jiva's (and its subsidiaries' and affiliates') customers and vendors away from Jiva and for his own business or the business of a competing company, while employed with Jiva.

36

167.   Wilkinson knowingly and willfully breached his duty of loyalty to Jiva by scheming to deceive, defraud, and undermine Jiva, misappropriating and stealing Jiva's (and its subsidiaries' and affiliates') trade secrets and assets, and attempting to divert Jiva's (and its subsidiaries' and affiliates') customers and vendors away from Jiva and for his own business or the business of a competing company, while employed with Jiva.

168.   Quattry acted in a manner inconsistent with his duty of loyalty to Jiva by soliciting Jiva's (and its subsidiaries' and affiliates') vendors and customers on his own behalf or on behalf of a competing entity, and by diverting and misappropriating Jiva's (and its subsidiaries') sales, profits, and property while employed with Jiva.

169.   Wilkinson acted in a manner inconsistent with his duty of loyalty to Jiva by soliciting Jiva's (and its subsidiaries' and affiliates') vendors and customers on his own behalf or on behalf of a competing entity, and by diverting and misappropriating Jiva's (and its subsidiaries') sales, profits, and property while employed with Jiva.

170.   As a direct and proximate result of Quattry and Wilkinsons' breaches of their duty of loyalty, Jiva has been injured and is entitled to damages in an amount to be determined at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit. Jiva is further entitled to disgorgement from Quattry and Wilkinson,

and the forfeiture and return of all monies and compensation paid to them during their period of disloyalty, the precise amount to be determined at trial, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

## COUNT VI

### (Conversion Against Quattry and Wilkinson)

171.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

172.   Following Quattry and Wilkinson's last day of employment for Jiva, both Quattry and Wilkinson continued to possess and/or control the following company assets, including: (1) Jiva's (and some of its subsidiaries') financial records, including banking, payroll, personnel, and customer records; (2) access credentials to Jiva's (and some of its subsidiaries') bank accounts; (3) access credentials to Jiva's (and some of its subsidiaries') Microsoft Portals and QT Consulting domains; (4) Jiva's (and some of its subsidiaries') electronic devices, including computers and servers; (5) Jiva's (and some of its subsidiaries') software licenses; and (6) Jiva's (and some of its subsidiaries') intellectual property (collectively, the "Company Assets").

173.   During and after their employment with Jiva, Quattry, Wilkinson, and others have used some of the Company Assets, including proprietary customer and vendor information, to launch their competitive

38

venture, ERP.

174.   During and after their employment with Jiva, Quattry, Wilkinson, and ERP continue to use the Company Assets, including Confidential Information, Customer Information, and Vendor Information, for their competitive venture, ERP.

175.   Despite Jiva's repeated efforts to retrieve the Company Assets, including an October 29, 2022 letter sent via U.S. Certified mail and e-mail, Quattry and Wilkinson refused to return them or make them available for Jiva to retrieve.

176.   In December 2022, Quattry conditioned the return of some Company Assets on the payment of alleged debts owed to Wilkinson and him.

177.   Jiva is hopeful Quattry and Wilkinson will turn over or are in the process of voluntarily turning over some or all of the Company Assets soon.

178.   Additionally, between approximately August and October 2022, Quattry and Wilkinson diverted revenue and other company funds earned by Jiva and its subsidiaries into secret bank accounts controlled only by them (the "Diverted Funds").

179.   The Diverted Funds includes a payment from Jiva customer, Classic Performance Products, Inc., for $25,900 on around September 30, 2022.  This payment has never been received by Jiva.  Instead, Quattry, Wilkinson, and/or others transferred this amount into a secret bank account

controlled only by them.

180.   The Diverted Funds appear to total over $175,000 or more.  At no point has Quattry or Wilkinson returned any of the Diverted Funds to Jiva.

181.   As a direct and proximate result of Quattry and Wilkinsons' conversions, Jiva has been injured and is entitled to damages in an amount to be determined at trial of at least $175,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.  In particular, Jiva's inability to access Company Assets have led it to lose business and struggle to fulfill customer requests, in an amount to be determined at trial of at least $4,000,000, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

## COUNT VII

## (Tortious Interference With Contracts

## Against ERP, Quattry, and Wilkinson)

182.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

183.   Jiva (and its subsidiaries) had agreements to provide goods or services to the following customers: Osborne Industries, Air Electro, Inc., High Mountain Imports, Flyin' Miata, Visual Eyes Eyewear, LLC, Alpha Industries, Motor City Materials LLC, Terral River Services, Inc., The Arms Trucking, Co., Data Media Associates, HI TecMetal Group Inc., Lengamann

Corporation, and Power-Pack Conveyors, Inc. (the "Solicited Customers").

184.   ERP, Quattry, and Wilkinson had knowledge of Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers.

185.   ERP, Quattry, and Wilkinson also had knowledge of the Quattry Agreement and the Wilkinson Agreement.

186.   ERP, Quattry, and Wilkinson intentionally interfered with Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers in an attempt to cause the Solicited Customers to seek goods and services from ERP, rather than Jiva (or its subsidiaries).

187.   Jiva has lost significant revenue after each of the Solicited Customers stopped doing business with Jiva, which expected to earn the following over a five year period for each of the Solicited Customers: Osborne Industries ($185,000), Air Electro, Inc. ($280,000), High Mountain Imports ($185,000), Flyin' Miata ($396,000), Visual Eyes Eyewear, LLC $185,000), Alpha Industries ($462,500), Motor City Materials LLC ($196,495), Terral River Services, Inc. ($462,500), The Arms Trucking, Co. ($185,000), Data Media Associates ($210,555), HI TecMetal Group Inc. ($185,000), Lengamann Corporation ($185,000), and Power-Pack Conveyors Inc. ($185,000).

188.   ERP, Quattry, and Wilkinson lacked any justification for its intentional interference with Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers.

41

189.   Jiva suffered significant losses as a result of the Defendants' campaign to convert the Solicited Customers into clients of ERP, their new competitive company.  Jiva is thus entitled to damages in an amount to be determined at trial of at least $4,000,000, including a loss of goodwill, profits, and consequential damages, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

## COUNT VIII

### (Tortious Interference With Business Relationships Against ERP, Quattry, and Wilkinson)

190.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

191.   Jiva (and its subsidiaries) sought to provide goods or services to a number of past, current, and potential customers, including: Osborne Industries, Air Electro, Inc., High Mountain Imports, Flyin' Miata, Visual Eyes Eyewear, LLC, Alpha Industries, Motor City Materials LLC, Terral River Services, Inc., The Arms Trucking, Co., Data Media Associates, HI TecMetal Group Inc., Lengamann Corporation, and Power-Pack Conveyors, Inc. (the "Solicited Customers").

192.   ERP, Quattry, and Wilkinson had knowledge of Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers, as well as other potential customers.

193.   ERP, Quattry, and Wilkinson also had knowledge of the Quattry Agreement and the Wilkinson Agreement.

194.   ERP, Quattry, and Wilkinson intentionally interfered with Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers, as well as other potential customers, in an attempt to cause the Solicited Customers or potential customers to seek goods and services from ERP, rather than Jiva (or its subsidiaries).

195.   Jiva has lost significant revenue after each of the Solicited Customers stopped doing business with Jiva, which expected to earn the following over a five year period for each of the Solicited Customers: Osborne Industries ($185,000), Air Electro, Inc. ($280,000), High Mountain Imports ($185,000), Flyin' Miata ($396,000), Visual Eyes Eyewear, LLC $185,000), Alpha Industries ($462,500), Motor City Materials LLC ($196,495), Terral River Services, Inc. ($462,500), The Arms Trucking, Co. ($185,000), Data Media Associates ($210,555), HI TecMetal Group Inc. ($185,000), Lengamann Corporation ($185,000), and Power-Pack Conveyors Inc. ($185,000).

196.   Jiva has also lost significant revenue after potential customers, with who it had business relationships, decided not to use its products and services due to the efforts by ERP, Quattry, and Wilkinson to dissuade them from using Jiva's services.

197.   ERP, Quattry, and Wilkinson lacked any justification for its

43

intentional interference with Jiva's (and its subsidiaries') customer relationships with each of the Solicited Customers.

198.   Jiva suffered significant losses as a result of the Defendants' campaign to convert the Solicited Customers and other potential customers into clients of ERP, their new competitive company.  Jiva is thus entitled to damages in an amount to be determined at trial of at least $4,000,000, including a loss of goodwill, profits, and consequential damages, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

## COUNT IX

### (Civil Conspiracy Against Quattry and Wilkinson)

199.   Jiva repeats and re-alleges the allegations in the preceding and latter paragraphs of the Complaint as if fully set forth herein.

200.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others agreed to start a competing business with Jiva (and its subsidiaries).

201.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, had discussions about how to solicit Jiva's (and its subsidiaries') customers.

202.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, had discussions about how to solicit Jiva's (and its subsidiaries') employees.

44

203.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, had discussions about how to convert Jiva's assets for their own personal benefits, and to the detriment of Jiva.

204.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, intentionally sought to solicit Jiva's (and its subsidiaries') customers.

205.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, sought to solicit Jiva's (and its subsidiaries') employees.

206.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, incorporated ERP to compete with Jiva (and its subsidiaries).

207.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, obtained an employment information number for ERP to compete with Jiva (and its subsidiaries).

208.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson

Agreement, respectively, obtained domain names for ERP to compete with Jiva (and its subsidiaries).

209.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, activated emails for ERP to compete with Jiva (and its subsidiaries).

210.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, converted Jiva's (and its' subsidiaries') assets without authorization so ERP could compete with Jiva (and its subsidiaries).

211.   Prior to the end of their employment with Jiva, Quattry, Wilkinson, and others, in violation of the Quattry Agreement and Wilkinson Agreement, respectively, used Jiva's Confidential Information, Customer Information, and Vendor Information, without authorization so ERP could compete with Jiva (and its subsidiaries).

212.   Jiva suffered significant losses as a result of Quattry and Wilkinson's efforts to take Jiva's (and its' subsidiaries') customers and potential customers, use Confidential Information, Customer Information, and Vendor information, and convert company assets, so that their new company ERP, could compete with Jiva.  Jiva is thus entitled to damages in an amount to be determined at trial of at least $4,000,000, including a loss of

goodwill, profits, and consequential damages, plus interest under Fla. Stat. Ann. § 687.01, and Jiva's attorneys' fees and costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, Jiva prays for a judgment against ERP, Quattry, and Wilkinson, as follows:

A.      For damages in the sum of at least $4,000,000;

B.      For prejudgment interest;

C.      For Jiva's attorney fees and costs incurred;

D.      For an accounting;

E.      For preliminary and permanent injunctive relief, including an attachment of ERP's, Quattry's, and Wilkinson's assets; and

F.      For such other and further relief as the Court deems just and equitable.


Dated: December 21, 2022          Respectfully Submitted,

                                  */s/ Sean J. Lowe*
                                  Sean J. Lowe (Lead Counsel)
                                  Cal. Bar No. 295653 (*pro hac vice pending*)
                                  **Flowe Legal, P.C.**
                                  5317 S Mullen Ave
                                  Telephone: (424) 243-5020
                                  Email: Sean@Flowe.Biz
                                  *Counsel for Plaintiff Jiva InfoTech, Inc.*